May it please the Court. Thomas Mayer for Mr. C. G. Chang, Appellant. The Justice Department recently clarified the requirements for asylum protection with regard to husbands of women forced to abort in China. Or anywhere. Just wait one minute, because I can't hear. Oh, my apologies. They reach at the door, and perhaps one of the marshals could tell them to congregate down further away from the courtroom. Go ahead. Shall I begin over? Yes. The Justice Department recently clarified the requirements for asylum protection with regard to husbands of women forced to abort. Can I just back up for a minute? There was a finding here that your client was resettled in Honduras, right? Yes, Your Honor. You haven't challenged that, right? I'd like to. But you haven't before the BIA. It's an exhaustion. I believe that's correct, Your Honor. So isn't China just off the table? No, Your Honor. Well, isn't that the rule that if you're resettled, if he was resettled in Honduras, then that would be the end of his claim for asylum from China? Except that he personally was persecuted in China as well, Your Honor. But it doesn't matter. He's firmly resettled in Honduras. He's a Honduran citizen, right? Well, he held dual citizenship. Right. Still is a citizen of Honduras. Yes, he is. So how do you get around that? Well, Your Honors, the issue is that here, he and his wife wanted to marry. They were planning to marry, and she became pregnant. When she discovered she was pregnant, it was a difficult pregnancy marked by severe morning sickness. She was discovered by her work unit as being pregnant, and she and her husband agreed that they would try and fight it. What they did was first they tried to get a marriage license. Because her work unit knew that she was pregnant, they were not given a marriage certificate. They were precluded from getting married and therefore delivering the child. I think what you want to be arguing is that while resettlement would bar Chang's asylum claim, it wouldn't necessarily bar his withholding claim, and his withholding claim is based on the statute regarding China's population control policy. Yes. So that if you had a chance, if you had made that argument to the VIA, you might have had a chance for withholding. But I don't know how you get there procedurally from where you are here. We would have to revand for consideration of your withholding claim, recognizing that resettlement won't bar it. But I don't know if we can revand since you didn't ever raise it. The issue is that his wife is still at home. We understand that, but you're not dealing with our problem. Right. Because we are an appellate court that can decide issues that were properly exhausted before the VIA. And if your client was firmly resettled in Honduras, you don't have the asylum claim. And for reasons Judge Warlaw has suggested, you seem to have some difficulty with a withholding claim as well. So maybe it would make more sense to discuss Honduras at this point. Well, when he went to Honduras, it's my contention that he was not firmly settled while he did. That's your contention, but you never brought it to the VIA. I understand that. I'm sorry, Your Honors. Did you handle this case before the VIA? No, sir, I did not. Mr. Chang, can that be ‑‑ well.  Your Honors, if we ‑‑ well. What is the ultimate relief that your client wants here from us? He would like withholding asylum or the protections of the conventions against torture. If he is ‑‑ when he was in Honduras, where he is a citizen, he was acting as an agent, an unregistered agent of the Chinese government. He explained in his declaration as well as in his testimony that he was paid by the Chinese government. He reported to the Chinese government. He traveled back and forth between China and Honduras regularly. And as a result of his working for the Chinese government, the Taiwanese government, which has diplomatic relations with Honduras, became quite upset at the inroads he was making. He was followed. His car was sabotaged on two occasions. But not by the agents of the Honduras government, by the Taiwanese, is that right? That is correct, Your Honor. However, he dared not to report it because he claimed that the Taiwanese government, with their very strong ties to the Chinese government, or to the Taiwanese government, would provide him no protection. The Honduras would provide him no protection. That's correct, Your Honor. And on what basis is there in the record that indicates that? He describes the level of lawlessness when asked why he didn't bring his wife and his child to Honduras if he purportedly relocated there. He said that it was much too dangerous, that when he went home, he would spend two to three months in China with his family, and he said word for word that his home was in China. Counsel, was there a different counsel both before the IJ and the BIA? Yes. Because in the record, I'll just share with you what was put in the record on the relation of the Honduran government to the Taiwanese is pretty skimpy. But outside this record, there's actually evidence of their relationship and working together. Yes. Have you thought to suggest this, that maybe seeking reopening based on matter of lazada? I have considered it, yes. And that would be highly or well supported by the fact that the trial judge excoriated the original trial counsel, the private counsel, for the basis of not being prepared, and after badgering her for a few minutes, she agreed to go ahead on that particular day with her direct examination. So, yes, Your Honor, I have considered that, but I wanted to exhaust my opportunities here. In any event, as a citizen of Honduras, my client, as I said, was shadowed. But we see that all that relates to Taiwanese. You've got to show the nexus between the Honduran authorities and the Taiwan people who supposedly were after your client. And the record is really short. It is very short. They had diplomatic ties between the two countries. And they supplied him with police cars and so forth. Yes, Your Honor. There's nothing much more than that to show persecution or nexus. The nexus is that they were able to do this without any problem. My client, if you'll allow me, it's outside the record, but he did mention that the Chinese community was always in danger there, that some associates of his were kidnapped. But there's nothing to indicate that a complaint was made to the Honduran police and that they were unwilling to control the situation or investigate it or take any steps. That's all. That's correct, Your Honor. Absent from the record. That's correct, Your Honor, because my client felt that due to the close relationship, the visible close relationship that they had, that any complaint he would have made would have made him a bigger target. What is the evidence that this has – that it was a Taiwanese government that cut his – the evidence that somebody cut his brakes was his – Okay, he was – Well, his mechanic said so the second time that the brakes fell. It was more than that. His mechanic told him that the line was cut. But much more importantly, two days before the first attack on his car, he had been warned by the manager of a restaurant that had been – that had overheard the Taiwanese delegation speaking there among themselves, saying that they were going to hurt him, unquote. Oh, that's pretty remote. Well, Your Honor, he gets a warning. Two days later, his car brakes are partially disassembled. The next day, the line is cut. He didn't hang around for a third day to see what was going to happen. I think that's pretty reasonable. Do you want to reserve the rest of your time? Yes, yes. That's what the government has to say. Thank you. Thank you, Your Honor. Good morning, Your Honors. May it please the Court, Charles Kanner, on behalf of the Attorney General. To clear up a little confusion, because this is kind of an unusual case, if nothing else, just facts that are alleged. Asylum in China, as Your Honor stated, is completely off the table. The resettlement bar does not bar withholding. However, as far as the – he really hasn't challenged denial of withholding, per se, in his brief to this Court. If not well articulated in his brief before the Board, there is, at least in the conclusion section, is it reversed the denial of withholding. So that might be enough. And the Board did address, when they were addressing the arrest and detention in October of 2004, they were addressing withholding. But he's not challenged it in his brief here. His brief is strictly an asylum – a challenge to the asylum claim. And there is no asylum claim before the Court as to China because of the resettlement bar. In addition, CAT has been waived as to both countries. And withholding has been waived as to Honduras. They're leaving us with Honduras. You're right, Your Honor. It really leaves us with Honduras. And to clear up the record, he was not – there's nothing in the record that says he was an agent of the Chinese government. He was an employee – he was paid by a trade association in Hong Kong. I believe there's – he testified that that trade – that there is a group – it's a corporation owned by the Chinese government, but that's not saying he's an agent of the Chinese government. Well, ultimately, everything traces back to the government. Well, ultimately, ownership in many – in many things traces back to the government, but that doesn't mean he's an agent. Can you say he was sufficiently an agent of the government? I think he was working – Excuse me. I'm sorry. To conclude that there was – if there was persecution, it was based on political opinion. No, I don't – well, I guess maybe I should unpack that, Your Honor. Yes, it's established in the record that he was part of the goal – part of his duties, which he was paid for by this trade association, was to develop trade connections with China – And diplomatic relations. I don't think it's exactly that – he claims that it was all behind the scenes and it was sort of the unstated assumption that it was diplomatic relations. But what's actually in the record is he set up a trade show. He was meeting with many Honduran government officials. He arranged for Honduran officials to travel to China? To travel to China, yes. I think it's a – he's primarily working to set up trade relations, and so I'm not sure it's quite accurate to say he's an agent of the Chinese government. But more to the point – But working to set up trade relations on behalf of your country is actually a political activity that you do on behalf of your government. For example, the United States has a trade representative, which is appointed by the president. Right. And lots of people work for him. That's considered part of the government's political activity. I understand that, Your Honor, but it would be different if, for example, a private industry group sent someone to a particular country to try to – In China, we know that nothing's really private. Nothing is really private, Your Honor, but I don't think it's accurate. I don't know why we're so focused on this because, I mean, the IJs seem to credit it. Let's skip beyond to where the IJ ruled against him and is trying to defend. And the next point is that just because he's working enough to say he's an agent of the Chinese government, it doesn't mean that the persecution is on account of political opinion. So there's a nexus aspect of the denial of asylum in Honduras. It's simply they might be trying to stop some sort of development, some competition, but that's not saying they're persecuting him on the basis of political opinion in the same sense that we see asylum claims where people are persecuted for political opinion because they are in some – because they hold some position, some political opinion. But the desire is the desire of the Honduran government to maintain relations only with Taiwan and not with China, and the Taiwanese and the Hondurans get together to harass and give a problem to Chiang. You might have something there. Perhaps if there was any evidence at all that the Honduran government was resistant in any way to – was resistant in any way to developing some sort of relationship, at least as far as trade goes, with China, and if there was any evidence whatsoever in the record that the Honduran government would turn a blind eye to these attempts, these alleged attempts or suspected attempts by the Taiwanese delegation to harm Mr. Chiang. I think there's an aspect of this case that's easily overlooked, and that is, on the one hand, Mr. Chiang has had a business and he's got a factory and he's employing all these people. He has all these connections so that the – so that he goes to Honduras and for years is meeting with government officials, with congressmen. He's working – he's going to – they're arranging for them to go to China. Now, Mr. Chiang is no longer working for the Chinese government, right? I – no, I don't think he is. I think they are – I think they are – If he were sent back to Honduras, presumably, whoever was mad at him wouldn't be mad at him anymore because he's not working for the Honduras government – for the Chinese government. Presumably, yes, Your Honor. And that's the issue that's never been raised. That issue has not been raised, that whether there's been a – some sort of fundamental change in circumstances. But as to the actual decision, the claim is – the claim is, on the one hand, I have all these ties with the government and I can set up this trade association to which the Honduran government is presumably very receptive, and I'm a citizen of Honduras, yet on just – by my – yet if I went to the police and said the Taiwanese are trying to kill me, that they would – they would do nothing. And the only evidence for that is simply – Well, if he could prove that, he'd have something, wouldn't he? If he could prove that, but there is nothing in the record that would compel the conclusion that that is the case. It's simply his suspicion is that it was the Taiwanese government, and then it's his suspicion that if he – that the Honduran government would do nothing to him. His suspicion is not compelling evidence. It doesn't compel a contrary result. So with that, one other thing to clarify as far as the evidence. Mr. – 106, 107 of the record, Mr. Chang testified that he didn't ever – he never received any direct threat from the Taiwanese, and it was in December over a month after the actual accidents with his brakes that he was told by the restaurant owner that I overheard the Taiwanese talking about you. During the – during the trade show or around the time of the trade show, they were talking about you because they were understandably, as the immigration judge held it, they're understandably upset that there might be some encroachment as to competition. And so it's simply not the case that it was before the accident he was – he, you know, heard – got some – received some sort of warning. It was afterwards, and then that presumably is what prompted him to close down his factory, which is a separate party. It's kind of confused, I think, in the – it's a little confusing. He actually – he went to China first, and he and some of his partners set up a factory. And that's a separate – a separate field in the – Can I ask just one question about China? Sure. I'm not entirely clear that the withdrawing issue is gone. So in case we have to get to that, which I'm not playing about at this point, the government's position is that they had to be married at the time of the abortion. Yes. As I understand his claim, it's that the abortion has had an impact on them as married people. I mean, so that's a little unusual because they weren't married, but now they are married. Right, right. Well, first of all, the government's position is that was that they would have to be married. Now it's simply he would have to show – that's the whole of JAS. He would have to show it was – he was sterilized or he was persecuted, as well as found a fear of some persecution on account of resistance, that simply the per se rule is gone. Under this Court's precedent – I thought the – I thought that our case law with regard to spouses came directly out of the BIA. It did. It did. And that's – but the Attorney General's overruled that in JAS, as in the 20HA legislation. Not entirely. If you read it carefully. It overruled the per se rule that would say where under CYZ that you could simply – you can't simply come in and claim my wife was forced to have an abortion, therefore I get asylum. And that was the old rule. And the rule now is – He has to say that then he opposed it. Right. He would have to say I was persecuted or I have a well-founded fear of being persecuted on account of some resistance. So is there a rare case where you're going to have the husband saying they came in and forced my wife to have an abortion and I cheered them on and said, hey, let me help you drag her to the hospital? Well, Your Honor, unfortunately in these cases and one of the reasons the Attorney General cited, and Judge Minor would be aware of this in the Second Circuit, the way these cases actually happen after the CYZ rule was announced is that you had many, many men from China coming and claiming my wife was forced to have an abortion. And so while she was forced to have an abortion, there was a fine. They levied a fine on her and I got away. They got her, I got away, and now I'm here. And in fact – A lot of asylums were granted on that basis. A lot were and some that were not. Some that were not, for example, on credibility grounds, I've seen these personally, what you have is an alien remains in the country because enforcement efforts in New York are not terribly strong, and then down the road you'll get a motion to reopen based on the birth of children in the United States because now it turns out that this man who claimed to have been married or had a girlfriend in China, he's actually married someone else now and he has children in the United States, and that forms a basis to reopen because my ex-wife is mad at me because we separated. I think we're getting a little far-field in this case. You're right. We are indeed. I think the better way to proceed with JS as far as China is, one, that the withholding claim has been waived and we don't need to address it. Two, that under this court's precedent, you'd have to be married or you'd have to be prevented from being married on account of your age, and the record is very clear they were not married because his wife didn't want to get married at the time. That is his testimony. How about Honduras, if you're going to sum up? As to Honduras, there's nothing in the record that compels the conclusion that he's going to be, that the Honduran government in any way either was not able or was unwilling to stop any harms that may have been brought upon Mr. Chang from the, by the Taiwanese government. One just final point is regarding China, too. I understand it's probably not relevant to the Court's analysis, but Mr. I always love hearing points that are not relevant to our analysis. I just wanted to reassure the Court that there's, he's been ordered to remove two Honduras and the alternative. We know that. We read the decision. And so therefore, and there is practically no problem removing aliens to Honduras, such that the odds of him, of the government needing to move him to China are exceedingly slim, and actually right now the Chinese government is kind of refusing some aliens during the Olympics. So the odds of him being removed to China are exceedingly small. All right. Thank you, counsel. Thank you. Your Honor, as I say, I have very little time remaining, and I'll try to keep this as brief as possible. I appreciate your kindness. In Mr. Chang's statement, and I'll quote here, I joined the association in 1996. Hong Kong General Association of International Investment was actually an organization led by the Chinese Communist Party, the Central Department of Unification Strategy. They provided him with the money to open the factory. They paid him his salary. I think that's not an issue you have to worry about. Very well, Your Honor. If I may touch upon the claim of the government in terms of the fact that they were not married at the time. That is correct. However, in JS, it leaves the door open as far as if he resisted and if they were precluded from being married. What have you shown to get in that door? See, the problem, as government counsel points out, is that the reason they didn't get married was not for any of these other reasons. The reason they didn't get married is because she said no. Well, actually, that is not entirely accurate based on his statement. I'm sorry, on his testimony in the trial court. Excuse me one moment. It's okay. We can look it up. I can provide a site. Okay. Better yet, I'll summarize very quickly. Mr. Chang was explaining that the two of them wanted to get married. He applied for a wedding certificate. They were denied because she was pregnant. The judge then was not following the reasoning and said, okay, give it to me real short. What else do you have or what do you have? And he said, well, and she hadn't agreed yet. But they had tried to get the wedding certificate. And I think he called it a quota instead of a permit, which is an often common mistranslation. But there's a sudden shift in the entire response from the respondent in the trial court based on the judge's short temper. Unless you have any further questions, I'll withdraw. Thank you, counsel. All right. The session of this court for today will be adjourned. Thank you very much.
judges: Wardlaw, Berzon, Miner